UNITED STATES of America, Plaintiff-Appellee,

v.

John VARELLI, Roy Nielsen and Emil Crovedi, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Max HECKMYER, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Morris SALETKO, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Kenneth BRATKO and Joseph Rossi, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

John Anthony BORSELLINO, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Thomas Daniel BAMBULAS and Albert Cardenas, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Anthony LEGATO, Frank Gallo, and Ernest Infelice, Defendants-Appellants.

Nos. 16347–16349, 16388–16395, 16346.

United States Court of Appeals Seventh Circuit.

Feb. 11, 1969.

Thomas A. Foran, U. S. Atty., Chicago, Ill., for appellee; Gerald M. Werksman, John Peter Lulinski, Asst. U. S. Attys., of counsel.

Edward J. Calihan, Anna R. Lavin, Jo-Anne F. Wolfson, Julius L. Echeles, John Powers Crowley, Frank W. Oliver,

Richard H. Devine, James G. Demopoulos, R. Eugene Pincham, Chicago, Ill., Robert S. Bailey, LeFevour & Bailey, Oak Park, Ill., for defendant-appellant, Ernest Infelice.

Before KILEY, CUMMINGS and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Defendants were indicted and tried together for committing various substantive offenses under Title 18 U.S.C. and for conspiring to commit the offenses.[1] The jury found all the defendants, except two, guilty on all counts and from these convictions all defendants appeal.[2]

## POLAROID SHIPMENT

On August 23, 1964, Schang, a government witness and co-defendant, was at the Riviera Bowling Alley in Melrose Park, Illinois, with defendant Bambulas and Boscarino (now deceased). While at the bowling alley, Schang was approached by defendant Crovedi, and together they went outside where defendants Rossi and Nielsen and Mendola (now deceased) were sitting in a 1957 Ford. Crovedi told Schang that he had information of a load of Polaroid cameras and equipment presently in a trailer in the Spector freight yard in Hillside, Illinois. Crovedi asked Schang if he had a place to hide the trailer, and if Schang did, he would "make it" the following morning. Schang said he had an available drop. Crovedi told Schang he would bring along defendants Bratko, Rossi and Nielsen and Mendola. Crovedi also indicated that he would bring the Ford as the work car, a radio and a work truck which he would use to stop the trailer and tractor. Schang agreed and said that Bambulas and Boscarino would go with him in a Dodge. They agreed to meet at Flip's Restaurant in Hillside, which was about two or three blocks from Spector's freight yard. Crovedi then entered the Ford and he, Nielsen, Rossi and Mendola drove off.

The following day, Boscarino picked up Schang from his home and they drove to the restaurant where they met Crovedi, Nielsen, Rossi, Bambulas, Bratko and Mendola. Together, they made arrangements for the hijacking.

At approximately 8:50 a. m., the Spector tractor-trailer was hijacked near Mannheim Road. Nielsen removed the driver from the truck and placed him in the Ford. He was released later. Meanwhile, Schang entered the tractor-trailer unit and, followed by the Dodge, drove 20 miles west on the Illinois East-West Tollway where he stopped. Rossi then drove the rest of the trip to Aurora, Illinois, followed by Schang, Bambulas and Boscarino in the Dodge.

The tractor-trailer and the Dodge were driven into the Rapid Truck Repair Garage in Aurora, owned by Frederick, another government witness and co-defendant. The seal of the trailer was broken and the trailer was found to be filled with Polaroid equipment. Some of the equipment was put in the Dodge, while the rest was loaded into trucks. The trucks were driven to another garage owned by Frederick in Aurora, Illinois. Schang then returned to the city in a pick-up truck with Bratko, Rossi, Frederick and Boscarino. Later that evening, Schang, Bambulas, Boscarino, Nielsen, Mendola, Rossi and Bratko met at the Riviera Bowling Alley to discuss disposing of the stolen equipment.

On August 26, 1964, three trucks, all filled with Polaroid equipment, were parked in Frederick's garage. Schang and Boscarino went to the H & H Restaurant in Chicago and met with defendant Saletko. According to Schang: "Angelo Boscarino told Maishe Bear [Saletko] that we had some Polaroid film, colored film, and we would like to sell it to him if he could handle it. Maishe Bear said that he could probably handle it, give him a day or two to handle it and we should contact him again." He

---

1. See Appendices A and B for details.

2. Schang and Frederick pleaded guilty at the trial.

was told that they had several hundred cases and expected around $20,000 for it.

The next day Saletko told them he could handle it. Thereafter, Boscarino left the truck at a public garage near the H & H Restaurant. The next day it was empty. Three or four days later, about the latter part of the first week of September, 1964, Schang and Boscarino went to the basement of the H & H Restaurant where Saletko gave them a package of money, "$17,500 or $15,000, somewhere around there."

In the middle of September, Schang met defendant Legato and told Legato he had some Polaroid cameras and film, the remaining parts of the Polaroid load that they had grabbed three or four weeks before. The next day, Legato took him to the home of defendant Infelice in Melrose Park where arrangements were made for Infelice to buy 400 cases of Polaroid film for $8,000. Infelice said that he knew a bunch of Arabs who ran a camera shop in New York City. They made arrangements to meet on the Indiana Toll Road on October 1, 1964, where, at the first restaurant on the Indiana Toll Road, Schang saw defendants Legato, Infelice, Gallo and Ziak.[3] He gave Ziak the keys to the truck which he opened and found about 400 cases of the film and cameras. Ziak, accompanied by Gallo, drove the truck in an easterly direction along the Toll Road followed by an automobile driven by Legato in which Infelice was a passenger.

About two days later, Schang went with Bambulas to New York where they met Legato and Infelice. Infelice gave him $6,000. Schang and Bambulas returned to Chicago where they distributed the money amongst Mendola, Boscarino, Bambulas, Rossi, Nielsen, Crovedi and Bratko. Subsequently, when Schang asked Legato for the rest of the money for the cameras sold in New York, Legato told him that Infelice could not collect from the people to whom he had sold them and hence the others would not be paid. Infelice verified this to Schang at a later date.

## SILVER SHIPMENT NO. 1

On April 18, 1965, defendant Anthony Borsellino informed Schang of a load of silver on an Interstate Systems truck parked in the Interstate yard in Cicero. At approximately 4:15 a. m. on April 19, 1965, while Schang and Bambulas waited outside the yard in the Dodge, Borsellino and Boscarino drove the Interstate unit out of the yard. They drove the unit to the Roadway Truck Stop operated by Frederick in Shabbona, Illinois.

The next day, Boscarino told Schang that he had sold the silver to Varelli and that they were to deliver the silver to him in two shipments. A few days later Bambulas and Schang drove one truck out to the Hinsdale Oasis and Bambulas left the truck and walked over to the phone booth. Max Heckmyer then got out of the car that was parked there. Schang saw Varelli standing by the phone booth. Heckmyer went over to the truck, entered it and pulled it away. Varelli left the phone booth, entered the parked car and pulled away, following Heckmyer down the road. A similar delivery was made a day or two later at the same place. Varelli made the initial payment of $20,000 and within a week or two he delivered an additional $40,000 to Boscarino and Schang.

## SILVER SHIPMENT NO. 2

In the early part of May, 1965, Schang, Bambulas, Boscarino and Borsellino were together at the Riviera Bowling Alley. Borsellino said that he had spotted a load of silver at the Spector yard where he was employed. Schang and Boscarino met Borsellino and Bambulas at Flip's Restaurant on Mannheim Road the same night. While Bambulas went to find Frederick and Schang, Boscarino and Borsellino proceeded to the Spector yard. The tractor-trailer was hijacked that night after it pulled out of Spector's

3. Ziak was indicted for conspiracy and aiding and abetting and pleaded guilty to both counts.

yard and was taken to the Roadway Truck Stop in Shabbona where the silver was transferred into two trucks.

Boscarino told Schang that he had talked to John Varelli and made arrangements to deliver both trucks to the Hinsdale Oasis, following the same procedure that had been used on the earlier two truck loads. Bambulas and Schang again delivered the trucks to the Oasis and saw Heckmyer and Varelli. Varelli paid $60,000 for the total shipment.

## SILVER SHIPMENT NO. 3

On October 6, 1965, about 4:30 in the afternoon, Schang received a telephone call from Borsellino, who asked him to come to a restaurant across the street from where he worked. Schang met Borsellino at the restaurant across from the Spector yard. He said that there was a load of silver parked in Spector's yard on a trailer and thought that he would bring it to Schang's attention so they could take a look at it.

Around 5:25 p. m., Schang observed a Spector tractor-trailer coming out of the yard. Schang and Borsellino followed the trailer to the entrance to the Indiana Toll Road where it went through the toll booth. They continued to follow the trailer down the Indiana Toll Road.

At one of the oases on the tollway Borsellino overpowered the driver and put him in the back of the trailer. The car and tractor-trailer then proceeded to Shabbona, Illinois. On the way Schang called Frederick to say he was coming. The tractor-trailer pulled into the Roadway Truck Stop where Frederick was standing at 3:00 a. m. The Spector driver was taken from the trailer, placed in the trunk of Schang's Ford and was not released until sometime the next day.

On October 8, at 9:30 in the morning, Boscarino and Bambulas arrived in a Dodge. They loaded some silver into the trunk of the Dodge and left. They came back in the afternoon and took another shipment.

That evening Schang went to Flip's Restaurant. Present were Borsellino, Bambulas and Boscarino. Schang told them that he thought that FBI agents were in the vicinity. They decided to dispose of the silver as quickly as possible. Bambulas, Boscarino and Schang left the restaurant and drove toward Shabbona. They stopped near it and waited for Borsellino. Then, they went to a restaurant in Elgin where Bambulas called Cardenas. Cardenas agreed to let them use a warehouse to store the silver.

Later Bambulas and Schang went to the warehouse in Elgin where they saw Cardenas, Boscarino and Borsellino. They unloaded the truck.

On the Wednesday following the silver hijacking of October 7, Schang met with Varelli at Delmar's Restaurant at 22nd and Mannheim. Varelli showed Schang a list that Boscarino had furnished him and said that he, Varelli, and Boscarino had agreed on the price of $9.00 a pound for the silver. Varelli told Schang that after the agreement he and Heckmyer had taken the silver out to "his man" and the man refused to pay more than $6.00 a pound for it. Later Boscarino told Schang that Varelli and Heckmyer picked up the silver at the warehouse and disposed of it.

## CONSPIRACY

The defendants have been convicted of a single conspiracy to hijack interstate shipments of merchandise, carry it away and distribute it. The government contends that whether or not a person was involved in the conspiracy is a question of fact for the jury, and since there was evidence to support the jury's finding, the conviction must be upheld. We disagree.

■■ Agreement is the primary element of a conspiracy. The formalities of an agreement are not necessary and are usually lacking since the mark of a successful conspiracy is secrecy. "The agreement may be shown 'if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.' Fowler v. United States

(C.C.A.9) 273 F. 15, 19." Marino v. United States, 91 F.2d 691–694 (9th Cir. 1937). While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies. See Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 922–35 (1959).

■■ The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at different times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

■ In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy. However, where various defendants separately conspired with a common conspirator to obtain fraudulent loans from an agency of the United States, the government conceded that there were several conspiracies since there was no overall goal or common purpose. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The Supreme Court in Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), where the court found one overall conspiracy, commented on Kotteakos:

The case therefore is very different from the facts admitted to exist in the Kotteakos case. Apart from the much larger number of agreements there involved, no two of those agreements were tied together. as stages in the formation of a larger all-inclusive combination, *all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects.* Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan. (332 U.S. at 558, 68 S.Ct. at 257) [Emphasis added]

Here the government failed to prove one overall general scheme among the parties to hijack trucks passing in interstate commerce, carry away the merchandise and distribute it. Boscarino, Bambulas, Borsellino, Nielsen and Schang had not agreed to join together to hijack various interstate shipments of merchandise. Rather, the evidence only shows two separate conspiracies: one to hijack a shipment of Polaroid equipment and the other to hijack silver shipments from the Handy and Harmon Company. The government contends that while direct evidence of such overall agreement is lacking, there is sufficient evidence from which the existence of an agreement can be inferred. We do not agree with the government that: "The testimony laid bare a sophisticated, complex and highly organized operation geared to the theft and disposal of large amounts

of valuable merchandise traveling in interstate commerce." [4]

"Every agreement has two dimensions: the persons privy thereto, and the objectives encompassed therein." Note, Federal Treatment of Multiple Conspiracies, 57 Col.L.Rev. 387 (1957). Schang, Bambulas, Nielsen and Boscarino were the common nucleus of separate conspiracies. The other Polaroid defendants were only involved in the single act of hijacking the Polaroid equipment and were not part of an overall scheme or plan.

[T]he scope of his [each defendant's] agreement must be determined individually from what was proved as to him. If, in Judge Learned Hand's well-known phrase, in order for a man to be held for joining others in a conspiracy, he "must in some sense promote their venture himself, make it his own," United States v. Falcone, 109 F.2d 579, 581 (2 Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), it becomes essential to determine just what he is promoting and making "his own." United States v. Borelli, 336 F.2d 376, 385 (2d Cir. 1964)

■■ In United States v. Aviles, 274 F.2d 179 (2d Cir. 1960) the court stated:

A single act may be foundation for drawing the actor within the ambit of a conspiracy. See, e. g., United States v. Carminati, 2 Cir., 247 F.2d 640, certiorari denied, 1957, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113. But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent. Thus, when two men join together to commit a single robbery, one may infer from their common participation in the robbery that they have conspired to commit the robbery. However, in a multiparty conspiracy of the sort revealed in the present case, with actors performing many different tasks in many places, the inference does not necessarily follow from one contact with one member of the conspiracy. (274 F.2d at 189–190)

We agree with the conclusion in *Aviles* that a single act performed with parties who are involved in more than one conspiracy may be insufficient to draw an inference of the existence of an agreement between the parties in the case of multiple conspiracies. Knowledge of the existence of the other parties to the conspiracies is insufficient. While the crime of conspiracy is completed as soon as the unlawful agreement is formed, United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910), it must be shown that this agreement was made prior to or during the consummation of the single act.

■ Schang, Nielsen, Bambulas, Boscarino and Borsellino were involved in many discussions taking place over a long period of time as to the possibility of hijacking silver shipments from the Handy and Harmon Co. There is no evidence of any discussions as to other possible hijackings. The hijacking of the Polaroid equipment did not find its ori-

---

4. The government advocates its conclusion on the basis of the following elements:

(1) A shipment was previously located and the trailer containing it adequately identified;

(2) a crew of hijackers was assembled;

(3) specially equipped work cars and work trucks were made available;

(4) the trailer was stopped and the driver or drivers made harmless;

(5) the trailer was driven to a previously arranged location (the drop) where it was hidden;

(6) the stolen merchandise was removed from the trailer and transferred to other vehicles;

(7) the hijacked trailer was disguised and disposed of so as not to lead to the detection of the thieves or the location of the stolen merchandise;

(8) the driver or drivers were disposed of without leaving clues;

(9) the hijacking merchandise was disposed of quickly to sources furnishing almost immediate cash;

(10) the sources had either outlets for disposing of the merchandise or means to conceal it.

gin in any of these discussions. Rather, Crovedi came to Schang, an admitted hijacker by trade, on August 23, 1964, and said that he knew of a shipment of Polaroid equipment which could be taken. While some of the parties who took part in the Polaroid hijacking were also involved in the silver hijackings, this alone is insufficient to support a finding of one overall continuous conspiracy. The conspirators in the Polaroid hijacking did not contemplate a series of hijackings in which all would partake. Rather, the Polaroid hijacking represented a single transaction with a single purpose. The fact that the object in both the Polaroid hijacking and silver hijackings were similar is insufficient to constitute an overall common conspiracy. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248 (1947).[Therefore, we conclude that there was insufficient evidence from which the jury could find a single overall conspiracy.]

## SEPARATE TRIALS

Having found that two conspiracies were proved instead of the one charged, this Court must decide whether the rights of defendants have been prejudiced by all the defendants being tried together. The leading case relied on by the defendants is Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239 (1946). In reversing the convictions, the court said: "[T]he dangers of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." (Id. at 774, 66 S.Ct. at 1252) While Kotteakos requires reversal here, this Court feels that the problems of multiple conspiracy litigation need a full airing.

The problem of whether or not a variance in the proof is substantially prejudicial under Rule 52(a) [5] of the Federal Rules of Criminal Procedure is intertwined with whether joinder is proper under Rule 8 [6] or whether Rule 14 [7] requires a severance. The United States Court of Appeals for the Second Circuit, Judge Learned Hand speaking for the court, concluded in United States v. Lekacos, 151 F.2d 170 (1945), reversed sub nom., Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239 (1946), that while more than the one conspiracy charged was proved at trial, the single trial did not prejudice the parties because

5. Rule 52. Harmless Error and Plain Error

 (a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

6. Rule 8. Joinder of Offenses and of Defendants

 (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based, on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

 (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constitut-ing an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

7. Rule 14. Relief from Prejudicial Joinder

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial. As amended Feb. 28, 1966, eff. July 1, 1966.

joinder of conspiracies was proper under Title 18 U.S.C. § 557.[8] However, the Supreme Court reversed, holding in part that joinder of the separate conspiracies was improper.

We do not think that either Congress, when it enacted § 269, or this Court, when deciding the *Berger* case [Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314], intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, *when the only nexus among them lies in the fact that one man participated in all.* Leeway there must be for such cases as the *Berger* situation and for others where proof may not accord with exact specifications in indictments. Otherwise criminal conspirators never could be brought to halt. \* \* \*

In so ruling we are not unmindful, as the Court of Appeals has held more than once, that the problem is not merely one of variance between indictment and proof or of the right application of the policy of § 269 for freedom of judgment, but is also essentially one of proper joinder under § 557 of the Judicial Code. When we look at that section's requirement for separate statement in different counts of related but distinct "acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments," our conclusion is reinforced. Kotteakos v. United States, 328 U.S. 750, 773–774, 66 S.Ct. 1239, 1252 (1946). [Emphasis added]

In *Kotteakos*, each conspiracy was directed at obtaining fraudulent loans from an agency of the United States. Each fraudulent loan transaction was completely separate and independent from every other loan. The inability of the government to show one overall conspiracy was not because of a failure of proof but stemmed from the individual nature of each transaction. The trial judge could have held the indictment invalid under the present Rule 8 of the Federal Rules of Criminal Procedure.

■ In Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960) joinder under Rule 8(b) was initially proper because of the conspiracy count but became improper when the judge dismissed the conspiracy count.[9]

8. 18 U.S.C. § 557 provides: "When there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments the whole may be joined in one indictment in separate counts; and if two or more indictments are found in such cases, the court may order them to be consolidated."
This statute was superseded by Rule 8 of the F.R. of Crim.P.

9. The facts were set out by the court:
The indictment charged transportation in interstate commerce of goods known to have been stolen and having a value in excess of $5,000. It contained three substantive counts. Count 1 charged the two Schaffers (petitioners in No. 111) and the three Stracuzzas (defendants below, who either pleaded guilty or had the charges against them *nolle prossed* at trial) with transporting stolen ladies' and children's wearing apparel from New York to Pennsylvania. Count 2 charged petitioner Marco and the Stracuzzas with a similar movement of stolen goods from New York to West Virginia. Count 3 charged petitioner Karp and the Stracuzzas with like shipments from New York to Massachusetts. The fourth and final count of the indictment charged all of these parties with a conspiracy to commit the substantive offenses charged in the first three counts. The petitioners here were tried on the indictment simultaneously in a single trial. On motion of petitioners for acquittal at the close of the Government's case, the court dismissed the conspiracy count for failure of proof. This motion was denied, however, as to the substantive counts, the court finding that no prejudice would result from the joint trial. Upon submission of the substantive counts to the jury on a detailed charge,

In concluding that the defendants were not prejudiced by joinder, the majority of the court in a 5 to 4 decision distinguished *Kotteakos:* "The harmless-error rule, which was the central issue in *Kotteakos,* is not even reached in the instant case, since here the joinder was proper under Rule 8(b) and no error was shown." 362 U.S. at 517, 80 S.Ct. at 948. Under *Schaffer* where there is a possibility of a variance between the indictment and the proof as to the number of conspiracies, and the possibility of a variance would result not from the nature of the transactions themselves as in *Kotteakos* but rather from a failure of the government to substantiate its charge in the indictment, such a possibility may be cured by proper instructions to the jury. See Berger v. United States, 295 U.S. 78, 82–83, 55 S.Ct. 629 (1935). Justice Douglas, joined by Chief Justice Warren and Justices Black and Brennan, in his dissent in *Schaffer* said:

> This is unlike the case where the conspiracy count and the substantive counts are submitted to the jury, the verdict being not guilty of conspiracy but guilty on the other counts. There is then no escape from the quandary in which defendants find themselves. Once the conspiracy is supported by evidence it presents issues for the jury to decide. What may motivate a particular jury in returning a verdict of not guilty on the conspiracy count may never be known. (362 U.S. at 523–524, 80 S.Ct. at 952.)

Too, in *Kotteakos,* the court concluded where joinder was proper, a jury could be instructed to differentiate between the various conspiracies:

> As we have said, the error permeated the entire charge, indeed the entire trial. Not only did it permit the jury to find each defendant guilty of conspiring with thirty-five other potential co-conspirators, or any less number as the proof might turn out for acquittal of some, when none of the evidence

would support such a conviction, as the proof did turn out in fact. It had other effects. One was to prevent the court from giving a precautionary instruction such as would be appropriate, perhaps required, in cases where related but separate conspiracies are tried together under § 557 of the Code, namely, that the jury should take care to consider the evidence relating to each conspiracy separately from that relating to each other conspiracy charged. The court here was careful to caution the jury to consider each defendant's case separately, in determining his participation in "the scheme" charged. But this obviously does not, and could not, go to keeping distinct conspiracies distinct, in view of the court's conception of the case. (328 U.S. at 769–770, 66 S.Ct. at 1250)

Since the existence of multiple conspiracies is really a fact question as to the nature of the agreement, it is for the jury to decide whether there is one agreement or several. United States v. Crosby, 294 F.2d 928 (2d Cir. 1961); Green v. United States, 332 F.2d 788, 789 (5th Cir. 1964); United States v. American Honda Motor Company, 273 F.Supp. 810 (N.D.Ill.1967). Therefore, the district judge should not under F.R. of Crim.P. 14 grant a severance or order "an election by the Government of the conspiracy it would prosecute," United States v. Goss, 329 F.2d 180, 184 (4th Cir. 1964), but, when the possibility of a variance appears, should instruct the jury on multiple conspiracies as well.

The nexus between conspiracies which permits joinder under Rule 8 is difficult to define. The Model Penal Code provides:

> [T]wo or more persons charged with criminal conspiracy may be prosecuted jointly if:
>
> (i) they are charged with conspiring with one another; or
>
> (ii) the conspiracies alleged, whether they have the same or different

each petitioner was found guilty and thereafter fined and sentenced to prison. (362 U.S. at 513, 80 S.Ct. at 946.)

parties, are so related that they constitute different aspects of a scheme of organized criminal conduct. Section 5.03(4) at 84, ALI Proposed Official Draft (1962).

Whether or not this standard is too broad, we are not prepared to decide. A.B.A., Standards Relating to Joinder and Severance, Tentative Draft (Nov. 1967). *Contra,* United States v. Borelli, 336 F.2d 376, 387 (2d Cir. 1964). However, we do not feel that "the number of possible conspiracies and conspirators," United States v. Goss, 329 F.2d at 184, is the sole criterion for the propriety of joinder. Such a nexus is different from an overall common purpose required for a finding of a single conspiracy. The nexus, as stated in Rule 8, is at least concerned with the identity of parties to the transaction, the character of the transaction, the modus operandi, the area of operations, the lapse of time, etc.

United States v. Spector, 326 F.2d 345 7th Cir. 1963) and United States v. Gougis, 374 F.2d 758 (7th Cir. 1967), do not lay down a *per se* rule requiring separate trials in all cases where joinder of multiple defendants may be improper. Judge Swygert, speaking for this Court in *Spector,* said: "[I]t is apparent in the instant case that there is no identity of defendants, of the character of the offenses, the allegations of fact, or of the time." *(Id.* 326 F.2d at 351). See also Ingram v. United States, 272 F.2d 567 (4th Cir. 1959), where joinder was totally improper from the beginning. In Gougis, the problem of prejudice from joinder foreshadowed the problem in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and is not applicable to the present case. We agree with the American Bar Association Advisory Committee on the Criminal Trial that:

[A] rigid sanction, whereby the prosecutor always would be required to undertake separate new trials, is unduly harsh. * * * See The Supreme Court, 1959 Term, 74 Harv.L.Rev. 81, 159–60 (1960). Moreover, "in practice [an automatic severance requirement] could militate against the very result that * * * [it] seeks to achieve. It is clearly possible that a trial judge, faced with a rigid rule requiring severance as a matter of law and consequent time consuming multiple trials, might be extremely reluctant to dismiss the charge upon which joinder is founded." 45 Minn.L.Rev. 1066, 1073 (1961). A.B.A., Standards Relating to Joinder and Severance, Tentative Draft (Nov. 1967).

Here, while the hijackings were sufficiently related to allow all the defendants to be tried together, there was not sufficient evidence from which it could be concluded that there was one overall conspiracy. The jury was not properly instructed in order that they could find multiple conspiracies and still find the defendants guilty. Without being properly instructed, it was possible for the jury to transfer guilt from one to another and to find defendants guilty of an overall conspiracy although they were only related to the Polaroid hijacking. We find it necessary to void the convictions of the defendants because their rights were substantially prejudiced by a single trial without proper instructions.

*Kotteakos* and *Schaffer* also require that all the defendants be retried on the substantive counts since the overwhelming guilt as to some may have unduly influenced the jury as to others who were less involved. The Court in *Kotteakos* stated that where the instructions were not proper, it was possible "[N]ot only for the jury to find that all of the defendants were parties to a single common plan, design and scheme, where none was shown by the proof, but also for them to impute to each defendant the acts and statements of the others without reference to whether they related to one of the schemes proven or another, and to find an overt act affecting all in conduct which admittedly could only have affected some." Kotteakos v. United States, 328 U.S. 750, 771, 66 S.Ct. 1239, 1251 (1946). See also Schaffer v. United States, 362 U.S. 511, 522–524, 80 S.Ct.

945 (1960) (Douglas, J., dissenting); United States v. Branker, 395 F.2d 881, 887–888 (2d Cir. 1968). While in some cases it may be possible to affirm the conviction of some defendants on substantive counts where the evidence is overwhelming, we find it unnecessary here to attempt to sort the evidence as to each of the parties since a new trial is required on other grounds. Having already concluded that there is insufficient evidence to support a finding of one conspiracy, we feel it would be prejudicial to the parties to remand this cause for a single trial of multiple conspiracies. Rather, on remand there should be two separate trials.

## PURCHASERS AS CONSPIRATORS

 Varelli, Heckmyer, Saletko, Infelice, Legato and Gallo were all involved with the *distribution* of merchandise stolen in interstate commerce. None of these parties were involved with the *theft* of either the Polaroid equipment or the silver shipments. The relation of buyer and seller even with knowledge of the character of the goods being sold is insufficient to make the buyer a conspirator. In United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204 (1940), the Supreme Court held the supplying of sugar to an illicit distiller, with knowledge that party will use the merchandise in furtherance of a conspiracy was insufficient to make the seller a co-conspirator. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), held that the commission of a substantive offense and a conspiracy to commit it are two separate crimes, but when agreement between two persons is necessary for the completion of the substantive crime, evidence of an additional agreement is required in order to constitute the crime of conspiracy. Cf. Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932). This Court in United States v. Ford, 324 F.2d 950 (7th Cir. 1963), said that the acts of buying and selling of stolen goods

without further agreement does not constitute the crime of conspiracy:

> The relationship of buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy to sell, receive, barter or dispose of stolen property although both parties know of the stolen character of the goods. In such circumstance, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective. *(Id.* at 952)

See also Judge Learned Hand's opinion in United States v. Zeuli, 137 F.2d 845 (2d Cir. 1943).

 Saletko, Infelice, Legato and Gallo were, at most, purchasers of stolen Polaroid equipment. Each took part in only one single transaction as part of the distribution of the entire truckload of Polaroid cameras and film. There was no evidence of any further agreement, and, therefore, they cannot be charged with conspiracy. Therefore, we find the evidence legally insufficient to convict Saletko, Infelice, Legato and Gallo of conspiracy.

 Varelli and Heckmyer became associated with the silver conspiracy. While they acted as purchasers of silver on the first shipment, the evidence is sufficient to conclude that they entered into a further agreement to dispose of future silver shipments. Varelli and Heckmyer by their further agreement became part of the conspiracy in that they agreed to assume a primary role in distributing further silver shipments. The other conspirators who were involved in the theft came to rely on Varelli's promise to dispose of the silver, and, therefore, it can be concluded that Varelli was more than the purchaser in *Ford* who had knowledge of the character of the goods.

## AIDING AND ABETTING

Infelice, Legato and Gallo were convicted under Count 6 of aiding and abetting in the theft of the Polaroid equipment. Title 18 U.S.C. Section 2, pro-

vides that aiders and abettors are punishable as principals. In Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180 (1946), the court held that evidence of being part of a conspiracy would be sufficient to support conviction on substantive offenses committed in furtherance of the conspiracy. As for the crime of aiding and abetting, the court in Nye & Nissen v. United States, 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949), said:

> And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. Pinkerton v. United States is narrow in its scope. Aid-and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one assists another in performing. The fact that a particular case might conceivably be submitted to the jury on either theory is irrelevant. It is sufficient if the proof adduced and the basis on which it was submitted were sufficient to support the verdict.

Too, as the court held in Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954):

> Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy.

 We conclude that the evidence does not support conviction for aiding and abetting. Judge Learned Hand in United States v. Peoni, 100 F. 2d 401, 402 (2d Cir. 1938), said that the crime of aiding and abetting requires that defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." Here the defendants' roles are similar to that of defendant Bollenbach in Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), (Bollenbach helped to dispose of securities in New York which were stolen in Minneapolis).[10] In both cases defendants were accessories after the fact and cannot be made principals under § 2: "[T]o constitute one an aider and abettor, he must not only be on the ground, and by his presence aid, encourage, or incite the principal to commit the crime, but he must share the criminal intent or purpose of the principal." Morei v. United States, 127 F.2d 827, 831 (6th Cir. 1942). Here defendants entered the scheme or plan too late to be considered aiders or abettors in the commission of the theft of Polaroid equipment.

### RESTRICTIONS ON CROSS-EXAMINATION

Appellants assert that the trial judge erred in failing to allow witnesses Frederick and Schang to testify as to their present addresses. In Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), the court reaffirmed the right to cross-examine a witness as to his present address. See also United States v. Lyon, 397 F.2d 505, 511 (7th Cir. 1968). The court, applying Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), said that it is error to require a showing of materiality since such a question may be used as a basis for further inquiry. The purpose of the inquiry is to make known

10. "Bollenbach could not properly be convicted for the offense for which he was charged and for which he was convicted, namely, for having conspired to transport securities across State lines merely on proof that he was a 'fence,' i.e., helped to dispose of the stolen securities after the interstate transportation was concluded. While § 332 of the Criminal Code, *supra*, made aiders and abettors of an offense principals, Congress has not made accessories after the fact principals. Their offense is distinct and is differently punished. (§ 333 of the Criminal Code, 35 Stat. 1152, 18 U.S.C. § 551.)" Bollenbach v. United States, 326 U.S. 607, 611, 66 S.Ct. 402, 404 (1946).

to the jury the setting in which to judge the character, veracity or bias of the witness. The court in *Alford* reversed the conviction because the possibility of the witness being in protective custody of the government was relevant to a determination of his prejudice. Since there is no requirement of materiality, it is not necessary to show the possibility of the witness being in custody in order to make such inquiry. In *Alford* the court said:

> Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. (282 U.S. at 692, 51 S.Ct. at 219)

▪ Although there is a right to cross-examine a witness as to his residence, it is not unlimited. Mr. Justice White, with whom Mr. Justice Marshall joined, in his concurring opinion in *Smith* stated (390 U.S. at 133–134, 88 S.Ct. at 751): "In Alford v. United States, 282 U.S. 687, 694 [51 S.Ct. 218, 220] (1931), the Court recognized that questions which tend merely to harass, annoy, or humiliate a witness may go beyond the bounds of proper cross-examination. * * * inquiries which tend to endanger the personal safety of the witness" are of such a nature. Where the government has shown that a witness' safety is in jeopardy, the burden may shift to the moving party to show the materiality of the request for the address while permitting the party to inquire as to the presence and influence of the government. United States v. Rich, 262 F.2d 415 (2d Cir. 1959). Inquiries as to whether or not the party is in custody or in the presence of government

officials or as to his standard of living are proper. But, there is no absolute right to the exact address of the witness where his safety is in doubt.[11]

▪ As to witness Frederick, the failure to disclose his exact address during trial was not error. Evidence of the possible danger to the life of Frederick is contained in the record, and on this basis the judge properly refused to allow disclosure.[12] The court told counsel for defendants:

> If you want to go into the details as to how well he is being taken care of and the fact that he is being fed and taken care of by the government, if that is the fact, why, you go ahead and do that. But I am not going to give you his address.

This case is different from United States v. Garafolo, 385 F.2d 200 (7th Cir. 1967), reversed per curiam, 390 U.S. 141, 144, 88 S.Ct. 841, 19 L.Ed.2d 970 (1968), where no inquiry as to the witness' location after the last illegal transaction was permitted. In *Garafolo* there was no evidence as to the witness' life being in danger.

▪ Witness Schang was requested to disclose his address prior to his moving to a hotel for the trial and the court denied the request. Evidence of a possible threat to Schang's life does not excuse the witness from making known his *prior* address. The government's objection to the disclosure was that the hotel where he was living during the trial may be located in the same area as his prior residence. Also, there was no showing of possible intimidation of Schang's family.

While counsel for the defendants were able to bring out that Schang was receiving special treatment (his bond had been reinstated), they were precluded

---

11. When there is a sufficient showing that the witness' life may be in jeopardy, one solution may be to require submission by the government of the relevant information to the district judge *in camera* for him to decide whether disclosure would present a real problem. Any such decision would be reviewable on appeal.

12. The trial judge was correct in ruling that it was error to present such evidence of danger to the jury. United States v. DiPietto, 396 F.2d 283, 288 (7th Cir. 1968).

from further inquiry. Both *Alford* and *Smith* would require the witness to disclose his prior address so there could be inquiry into other possible beneficial treatment and into his past activities. The court in *Smith* stated:

> [W]hen the credibility of a witness is in issue, the very starting point in "exposing falsehood and bringing out the truth" through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself. (390 U.S. at 131, 88 S.Ct. at 750)

In *Garafolo*, 385 F.2d at 207: "Defense counsel were permitted to inquire whether Haney received compensation from the Government, whether he had used an alias, and whether he had been promised leniency in return for his cooperation * * *," but the Supreme Court, in reversing, held that the mere existence of "a wide latitude allowed on cross-examination" did not justify a failure to disclose the address of the witness. The failure to make known Schang's prior address was error which unnecessarily limited the right of cross-examination. Therefore, on retrial Schang's prior address must be disclosed, thereby possibly opening new avenues of inquiry on cross-examination.

 Defendants also contend that the cross-examination of Schang was unduly restrictive in that inquiry should be allowed regarding Schang's obtaining the testimony of an alibi witness in his trial for bank robbery, in which he pleaded not guilty and was convicted. In essence, the claim is that Schang is either a perjurer or a suborner of perjury. Schang's credibility may be attacked by extrinsic evidence or by

cross-examination. The introduction of extrinsic evidence has been limited to prior convictions for various reasons.[13] However, such restriction does not apply to "[T]he extraction of the facts of misconduct from the witness himself upon cross-examination," 3 Wigmore on Evidence, § 981 at 547 (3rd Ed. 1940), subject to the exceptions for relevancy and self-incrimination. Since perjury would be relevant to the witness' veracity, cross-examination should be allowed on retrial.

## EAVESDROPPING

 Under the rule laid down by the Supreme Court in Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968), rehearing granted, *sub nom.* Alderman v. United States, 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1381 (1968), the district court on retrial must make an *in camera* inspection of the logs of any electronically overheard conversations involving any defendants in this case.

## PROSECUTOR'S ERRORS

Appellants claim that the prosecutor committed various prejudicial errors in the trial of the case. We agree with appellants that the prosecutor acted overzealously and we hope on retrial he will be careful not to repeat the same mistakes.

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he

---

13. According to Wigmore, there are two reasons for the restriction: confusion of issues and unfair surprise. 3 Wigmore on Evidence, § 979 at 536 (3rd Ed.1940). Cf. 3 Wigmore, § 980(a).

may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

In addition, we have considered the defendants' other contentions for reversal and either find it unnecessary to consider them at this time or find them to be without merit.

For the above stated reasons, we reverse and remand for new trials the convictions of Crovedi, Nielsen, Bratko, Rossi, Saletko, Bambulas, Borsellino, Varelli, Heckmyer and Cardenas, and reverse and dismiss Infelice, Legato and Gallo.

Reversed and remanded in part and dismissed in part.

## APPENDIX A

### INVOLVEMENT OF DEFENDANTS IN POLAROID SHIPMENT

| | Schang | Cro-vedi | Niel-sen | Bratko | Rossi | Bam-bulas | Sal-etko | Fred-erick | In-felice | Legato | Gallo |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Theft 18 U.S.C. §659 | x | x | x | x | x | x | | | | | |
| Possession 18 U.S.C. §659 | x | x | x | x | x | x | x | x | | | |
| Aiding and Abetttng 18 U.S.C. §659 | | | | | | | | x | x | x | x |

All defendants were indicted and convicted of conspiracy under 18 U.S.C. §371.

## APPENDIX B

### INVOLVEMENT OF DEFENDANTS IN SILVER SHIPMENTS

| | Schang | Bambulas | Borsellino | Frederick | Varelli | Heckmyer | Cardenas |
|---|---|---|---|---|---|---|---|
| **SILVER SHIPMENT #1** | | | | | | | |
| Theft 18 U.S.C. §659 | x | x | x | | | | |
| Possession 18 U.S.C. §659 | | | x | x | x | x | |

## INVOLVEMENT OF DEFENDANTS IN SILVER SHIPMENTS

| | Schang | Bambulas | Borsellino | Frederick | Varelli | Heckmyer | Cardenas |
|---|---|---|---|---|---|---|---|
| **SILVER SHIPMENT #2** | | | | | | | |
| Theft 18 U.S.C. §659 | x | x | x | | | | |
| Possession 18 U.S.C. §659 | | | | x | x | x | |
| **SILVER SHIPMENT #3** | | | | | | | |
| Possession 18 U.S.C. §659 | | x | | x | x | | x |
| Kidnapping 18 U.S.C. §1201 | x | | x | | | | |
| Aiding and Abetting 18 U.S.C. §2 | | x | | x | | | |
| Transportation of Stolen Vehicle 18 U.S.C. §2312 | x | | x | | | | |
| Receipt of Stolen Vehicle 18 U.S.C. §2314 | | x | | x | | | |
| Transportation of Stolen Goods 18 U.S.C. §2314 | x | | x | | | | |
| Sale or Receipt of Stolen Goods 18 U.S.C. §2315 | | | | | x | | x |

All defendants were indicted and convicted of conspiracy under 18 U.S.C. §371.