**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael CORTWRIGHT et al.,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edwin RICE, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edward DAILY, Jr.,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bennie Lee FELTON,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John Mark COOK,**
**Defendant-Appellant.**

Nos. 75–1246 to 75–1250.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 22, 1975.

Decided Dec. 9, 1975.

Rehearing Denied Jan. 6, 1976, in
No. 75–1246.

distribute controlled substances in violation of 21 U.S.C. § 846 and the conviction of one of these five on a substantive count of distributing narcotics in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, primarily present questions as to the sufficiency of the evidence.

### I

The sufficiency of the evidence in a conspiracy prosecution requires close scrutiny. As Mr. Justice Jackson noted in *Krulewitch v. United States,* 336 U.S. 440, 449, 69 S.Ct. 716, 721, 93 L.Ed. 790 (1949) (concurring opinion), "[t]he looseness and pliability of the [conspiracy] doctrine present inherent dangers which should be in the background of judicial thought whenever it is sought to extend the doctrine to meet the exigencies of a particular case." One of the major factors contributing to these dangers is the co-conspirator exception to the hearsay rule. The exception requires, at least in theory, a two-stage examination of the evidence:

> Strictly, the prosecution should first establish *prima facie* the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed.

*Id.* at 453, 69 S.Ct. at 723.

Thus, a reviewing court must make an independent evaluation of the record to determine, first, whether sufficient evidence was presented for a jury to con-

Michael E. Smith, James H. Voyles, Indianapolis, Ind., Ronald V. Aungst, Valparaiso, Ind., William G. Bruns, Muncie, Ind., Clifford G. Antcliff, Greenwood, Ind., for defendants-appellants.

John E. Hirschman, U. S. Atty., Charles Goodloe, Jr., Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before CLARK, Associate Justice,[*] and PELL, and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

These appeals, arising from the convictions of five persons for conspiring to

---

[*] The Honorable Tom C. Clark, Associate Justice of the Supreme Court of the United States (Retired), is sitting by designation.

clude beyond a reasonable doubt that the conspiracy existed and, second, whether there was sufficient non-hearsay evidence by which the jury could tie each defendant to the conspiracy.

 Conspiracy in its broadest definition "is a partnership in criminal purposes." *United States v. Kissel,* 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910). All that is required under 21 U.S.C. § 846 is an agreement between two or more persons to commit any offense under the Controlled Substances Act, in this case 21 U.S.C. § 841(a)(1).[1] The present conspiracy concerns a drug distribution network revolving around two main figures who acted as suppliers or wholesalers of illegal drugs and the appellants here who would best be classified as retail salesmen or pushers. In a conspiracy of this sort, "[t]he formalities of an agreement are not necessary and are usually lacking." *United States v. Varelli,* 407 F.2d 735, 741 (7th Cir. 1969).

> While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact.
>
> * * * * * *
>
> If there is one overall agreement [explicit or otherwise] among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy.

*Id.* at 742.

The government need only establish that a defendant joined in the agreement, and this may be proved by circumstantial evidence.

> A single act may be the foundation for drawing the actor within the ambit of a conspiracy. . . . But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent.
>
> * * * * * *
>
> From evidence of knowledge of the conspiracy and a transaction with one of its members it would be reasonable to infer intent to participate in it.

*United States v. Aviles,* 274 F.2d 179, 189–90 (2d Cir. 1960) (citations omitted). *Accord, United States v. Cardi,* 478 F.2d 1362, 1368–69 (7th Cir. 1973).

 The evidence adduced at trial showed that the conspiracy upon which the indictment was based was indeed a partnership in crime. The two ringleaders of the conspiracy, Richard Elder and Ewing Moore, pleaded guilty during the trial and testified for the government. Both admitted being the major drug "wholesalers" for a group of people who dealt in drugs in Indiana, Michigan and parts of the South. The conspiracy was alleged to have taken place from August of 1973 to March of 1974. Sometime in the late summer or early fall of 1973, Elder and Moore became equal partners in their drug distribution operations. They both testified that they dealt in cocaine and methamphetamine (speed) and Elder testified that he also dealt in lysergic acid diethylamide (LSD) and methaqualone (an animal tranquillizer). Clearly, a conspiracy in violation of 21 U.S.C. § 846 existed.

 In regard to the defendants who have appealed here, the evidence shows that all knew either Moore or Elder personally. Taking the defendants in the order they appeared in the indictment, we examine defendant Michael Cortwright's ties to the conspiracy first.

---

1. This circuit has not required allegation or proof of an overt act in furtherance of a drug conspiracy. *United States v. Garfoli,* 324 F.2d 909 (7th Cir. 1963) (concerning 21 U.S.C. § 174, now repealed). However, in this case since the indictment alleged three overt acts, the court below required that the government prove at least one. The overt act which the court required below was clearly proven beyond a reasonable doubt. The indictment alleged that three of the conspirators purchased airline tickets to Florida. Not only did the proof show that they purchased the tickets but one of the conspirators testified that the trip was made to purchase phencyclidine. Three other witnesses testified as to the trip.

Three witnesses testified that Cortwright offered to sell them "speed" (i. e., some type of amphetamine drug). One of these testified that Cortwright offered to sell him a quarter of a pound of speed, stating that "it was the same stuff that Elder had." Moore testified that he sold Cortwright an ounce of cocaine in the late summer of 1973, and Elder admitted having given drugs to Cortwright. Another witness testified that she helped Cortwright move his and his roommate's drugs to his parents' house because Cortwright was afraid of police detection. From this, the jury could have concluded that Cortwright dealt in drugs and that he was affiliated with and was supplied with drugs by Moore and Elder. Thus, there was sufficient evidence for the jury to find that Cortwright was part of the conspiracy.

█ Edwin Rice, another defendant-appellant here, was Cortwright's roommate during the period of the conspiracy. He knew Elder, and Elder testified that he had given drugs to Rice. Rice had drug dealings with the partnership, as Moore testified that he had sold Rice one pound of methamphetamine (speed) for $2,200 in Elder's apartment during January of 1974. Another witness testified that Rice had offered him diet pills and speed for sale during the period of the conspiracy. From this testimony, the jury could conclude that Rice also dealt in drugs, and that he knew of Moore's and Elder's drug activities when he purchased the methamphetamine from Moore. Hence, the jury could conclude that he also was a member of the conspiracy.

█ Defendant-appellant Edward Daily, the only defendant convicted on a substantive count as well as a conspiracy count, appears to have been a more active participant in the conspiracy than either Rice or Cortwright. The government's prime informant testified to being present when Daily paid Ron Beaty (another member of the Moore-Elder organization who was indicted but not present during the trial) for some "speed" and was to take delivery of the

drug later in the afternoon. Witness Elder testified that Daily flew with him and another defendant-appellant, Bennie Felton, to Miami, Florida to put together a drug deal. Elder added that Daily and Felton went with him to Florida because they were going to purchase some of the drugs acquired there. Elder also testified that Daily was present at another meeting at which the distribution of 100,000 tablets of methaqualone was discussed. Two of the exhibits presented at trial were copies of money orders, one for $600 and the other for $1,000, sent by Daily to Elder. Elder testified that both these sums were related to drug transactions. Another witness saw Daily in possession of drugs and testified that Daily had given her some "speed." From this, the jury could easily have concluded that Daily was a member of the conspiracy charged.

█ Bennie Lee Felton, the fourth defendant-appellant here, told the government's prime informant that he had accompanied Elder and Daily to Florida to put together a cocaine deal. Elder confirmed the fact that Felton went on the trip although he said they bought phencyclidine. Elder also testified that he sold some cocaine to Felton in March of 1974. Another witness testified that she had seen Felton in possession of drugs and that he had given her some. From this, the jury could reasonably have concluded that Felton was a member of the conspiracy.

█ The last defendant-appellant, John Mark Cook, filed a motion for a bill of particulars prior to trial. The court granted the motion and the government complied. The motion asked for a description of the overt acts Cook had done in furtherance of the conspiracy. The government answered that Cook participated in meetings in Elder's apartment in the fall of 1973 to deal in drugs. The court upon motion of the defendant refused to allow the jury to consider any other evidence against Cook than that which related to meetings in Elder's apartment in the fall of 1973. Although perhaps the court below unnecessarily

restricted the government's avenues of proof in such a manner (see 8 J. Moore, Federal Practice ¶ 7.06[1]), we need not reach that question inasmuch as the evidence admitted concerning Cook was clearly sufficient to tie him to the conspiracy. Elder testified that he and Cook met in his apartment two or three times during the fall of 1973. At one of these meetings Elder testified that he sold Cook one pound of methamphetamine for $2,000, which Cook then resold to someone else. Moore testified that he too was present in Elder's apartment when Cook bought the pound of speed. Elder testified that at another meeting he and Cook discussed a delivery of drugs which was to come from Canada and which he and Cook would meet in Detroit. They would distribute it from there. This testimony provides sufficient evidence from which the jury could have concluded beyond a reasonable doubt that Cook was a member of the conspiracy.

Against each conspirator, the government presented sufficient evidence to show that they participated in an ongoing drug distribution organization which was supplied with drugs for the most part through Moore and Elder and which distributed drugs to the consumers through the efforts of the defendants here. The jury returned a special verdict which found that the conspiracy distributed LSD, methamphetamine, cocaine and methaqualone. The evidence supported this verdict.

## II

■ In regard to the substantive count against appellant Daily for distribution of drugs in violation of 21 U.S.C. § 841(a)(1), the evidence presented by the government was not voluminous. The government's prime informant, Tucker, testified that he had arranged a drug deal between Elder and a federal agent. Tucker and Elder brought a pound of speed from Elder's apartment in Indianapolis to a rendezvous point in New Castle. There they met Ron Beaty, Edward Daily and three young women.

Elder got into Beaty's car because he did not trust the person who was to buy the speed and wanted Tucker to make the transaction. Tucker took Elder's car to where the sale took place. Elder, Beaty, Daily and the women followed and parked in a shopping center a block away to see how the deal "went down." Elder testified that he asked Beaty to be present in New Castle because he did not want to be present when the sale was made, but wanted to observe it from a distance. During the time they watched the sale take place, Beaty looked around for surveillance. Daily just talked to the women. As far as Elder knew, Daily did not know the purpose of the trip.

The substantive count of the indictment under which the jury found Daily guilty charged Daily with aiding and abetting in the New Castle transaction in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Evidence in regard to another transaction showed that Daily was not unfamiliar with Elder's methods of operation. When Daily travelled to Florida with Elder and Felton to make a drug deal, he and Felton waited in another room while Elder made the deal with his contact. Moreover, Daily was present on at least one other occasion when large drug deals of Elder's were discussed. In regard to the New Castle transaction, Daily's presence was of obvious aid to Elder. Elder feared that something would go wrong with the deal—either he would get "ripped-off" by the buyer or the buyer would turn out to be the police. Elder asked Beaty along to provide support in case any one of these contingencies happened. Daily, who was obviously closely involved with Elder and Beaty, by his presence would provide more support. Thus, the question which we face is whether the evidence was sufficient to show that Daily knew the purpose of the trip, in other words, whether he *knowingly* aided and abetted in the sale of the methamphetamine. We think that the evidence was sufficient for the jury to conclude that Daily knew the purpose of the trip. Even if no one in the car said anything

as to why they were there—which seems a reasonable assumption considering that the women were present—and even if Elder had not specifically asked Beaty to bring Daily along, it is a reasonable assumption that one who had dealt with Elder and Beaty as closely as Daily had and knew their ways, would be aware of the purpose of a trip to New Castle which involved an exchange of cars for Elder, a wait in a parking lot watching another person meet a contact a block away, and an exchange of cars back again for Elder. If we ask juries to apply their common sense knowledge of everyday life to the evidence they hear, this is one situation in which their common sense assumptions could lead them to a finding of knowing participation beyond a reasonable doubt.

### III

▮ The other claims that the defendants present can be quickly disposed of. The defendants[2] argued that the trial court's denial of their requests for more peremptory challenges denied them a fair trial. The granting of any additional challenges beyond the mandatory number, which in this case was ten, was within the discretion of the trial court. Fed.R.Crim.P. 24(b). The court actually did grant some additional challenges, and the appellants have pointed to no fact which would make the denial of their requests for further challenges an abuse of discretion.

▮ The defendants also contend that the court took too active a role in the questioning of witnesses and displayed prejudice against the defendants on a number of occasions. It is clear that a federal district judge has wide discretion in determining the role he will play during the course of a trial. However, at the same time his "participation during trial . . . must never reach the point at which it appears clear to the jury that the court believes the accused is guilty." *United States v. Nazzaro,* 472 F.2d 302, 303 (2d Cir. 1973). From a careful reading of the record below, we realize that the court did take an active role in the trial. This role, however, was confined to clarifying the issues for the jury, speeding the introduction of evidence, prompting reticent witnesses who preferred to mumble rather than testify clearly regarding subjects upon which they had already testified before the grand jury, and providing helpful hints to the defendants and their counsel.[3] Clearly, the judge remained within his proper bounds and his participation did not deprive the defendants of a fair trial.

A trial judge in criminal, as in civil cases, may, indeed must, be more than a mere moderator or umpire in a contest between two parties in an arena before him. He should take part where necessary to clarify testimony and assist the jury in understanding the evidence and its task of weighing it in the resolution of issues of fact. *United States v. DeSisto,* 289 F.2d 833, 834 (2d Cir. 1961).

▮ The defendants further claim that they were denied a fair trial because one of the defendants, who sat at counsel table and was "privy to confidential matters discussed between other defendants and defense counsel" and had the "opportunity to observe and hear the testimony of other government witnesses," pleaded guilty and was allowed to

---

**2.** The defendants in their briefs on appeal all adopted by reference the arguments of the other defendants which applied to them. *See* Fed.R.App.P. 28(i). We, therefore, take the arguments raised as applying to all defendants where logical.

**3.** As an example, one of the acts the defendants complain of occurred when the court counseled the defendants that in his observa-

tion a "defendant who whispers too many questions to his attorney to ask on cross-examination sometimes creates a question in the mind of the jury that he may know the facts in the case rather well." Had this been made in the presence of the jury, prejudice might have resulted, but as it was made outside their presence, it can only be construed as a very helpful hint.

testify for the government in violation of the court's order for separation of witnesses. Clearly, the court's order separating witnesses can only apply to those who are known to be witnesses at the time. After Moore, the defendant-witness here in question, pleaded guilty, he was no longer allowed in the courtroom. At all times prior to that, he had a constitutional right to remain in the courtroom because of his status as a defendant. The defendants were not denied a fair trial because of Moore's testimony. *United States v. Leftwich,* 461 F.2d 586, 589–90 (3d Cir. 1972).

Defendant Felton claims that a misstatement of the evidence made by the government in closing argument prejudiced the case against him. The misstatement appears unintentional. The prosecutor stated that one witness had testified regarding drug deals with Felton, when in fact another witness had so testified.

> Trials are rarely, if ever, perfect and improprieties of argument by counsel to the jury do not call for a new trial unless they are so gross as probably to prejudice the defendant and the prejudice had not been neutralized by the trial judge before submission of the case to the jury.

*Id.* at 590.

The misconduct here, if it can be called that, was "confined to a single instance" which could have caused little prejudice to defendants' trial. *Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

After their convictions, appellants Daily and Felton moved at different times for new trials based on newly discovered evidence. Their alleged evidence consisted of testimony indicating that one of the prime conspirators, Richard Elder, was a government informant. At both hearings which were scheduled, the witness for the defendants who was to testify to this fact did not appear. The government, however, produced witnesses who testified that Elder was not an informant. On this basis it is clear that the motion for a

new trial was properly denied. Also, as government counsel points out, evidence that Elder was an informant is not so material "that it would probably produce a different verdict, if the new trial were granted," and so does not fall within the test for newly discovered evidence justifying a new trial. *United States v. Marachowsky,* 213 F.2d 235, 238 (7th Cir. 1954).

We have considered all the other grounds which appellants present for reversal and have found them meritless. Double jeopardy is not violated by a trial on a substantive count and a conspiracy count. *Pereira v. United States,* 347 U.S. 1, 11–12, 74 S.Ct. 358, 98 L.Ed. 435 (1954). The trial court's denial of the motion for severance made by appellants Felton and Cortwright was proper since no showing of prejudice was made. Fed.R.Crim.P. 14.

The convictions of the defendants-appellants are affirmed.