**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert W. DAVENPORT; Thomas Edward Greer; Kenneth Charles Ford, Defendants-Appellants.**

Nos. 85–5458, 85–5459 and 85–5465.

United States Court of Appeals, Sixth Circuit.

Argued July 21, 1986.

Decided Jan. 13, 1987.

W. Gary Blackburn (argued), Barnett and Alagia, James N. Bryan, Jr. (argued), (Court-appointed), Vance Cramb, Jr. (argued), Nashville, Tenn., for defendants-appellants.

Joe B. Brown, U.S. Atty., Nashville, Tenn., Robert J. Washko (argued), for plaintiff-appellee.

Before WELLFORD and MILBURN, Circuit Judges, and DeMASCIO, District Judge.*

WELLFORD, Circuit Judge.

Defendants Kenneth Charles Ford (Ford, Jr.) and Robert W. Davenport appeal their convictions for transportation of stolen property in interstate commerce and a conspiracy to steal and possess goods taken from interstate commerce. For the reasons that follow, we AFFIRM the convictions.

## I.

Daniel Posante, a resident of Smyrna, Tennessee, was employed as a truck driver for Coronet Truck Lines. Posante hauled tractor-trailer loads of general merchandise, including jewelry and televisions, for Service Merchandise. Posante knew Kenneth Crozier Ford (Ford, Sr.), father of defendant Ford, as a used car salesman at Smyrna Auto Sales. In September 1984, Posante, while driving his tractor-trailer loaded with crockpots, stopped by Smyrna Auto Sales to make a car payment. There he removed some of the crockpots from his load.

A week or two later, Posante and a friend, Harmon Rager, stole goods from a trailer load bound to a store in Paducah, Kentucky. Ford, Sr. bought this merchandise from Posante and when doing so told him that if Posante could get any more "hot stuff" to contact him because he could always dispose of it.

Shortly thereafter, Posante and Rager discussed stealing additional merchandise from one of Coronet's trailers. They drove to Madison, Tennessee, where Rager rented a U–Haul truck. After returning with the U–Haul truck the two men again departed for the Coronet freight terminal

* The Honorable Robert E. DeMascio, United States District Court for the Eastern District of Michigan, sitting by designation.

where Posante hitched his tractor to a trailer load of merchandise destined to be shipped to a Burbank, Illinois, store.

Posante broke the seal on the trailer entrusted to Coronet. He and Rager then unloaded some merchandise into the rented truck. Posante then resealed the trailer and drove the tractor and trailer back to the Coronet terminal. Service Merchandise did not determine that some of its cargo was missing until the trailer reached its destination.

Rager unsuccessfully attempted to sell the stolen merchandise to his former employer. Afterward, Posante decided to contact Ford, Sr. to see if he could still dispose of the merchandise. His wife contacted Ford, Sr., who agreed to buy the stolen goods. Ford, Sr. and defendant Ford, Jr. drove to the Posante residence in the former's Cadillac automobile. Ford, Sr., accompanied by Mrs. Posante, then drove the rented moving vehicle to his residence, with Ford, Jr. following behind in the Cadillac. Ford, Sr., after paying Posante $1,500 for the stolen load, told Posante that they could have made more money if the goods had not included so many boxes of toys. Ford, Sr. indicated that he knew a source in Georgia that could handle better merchandise.

Approximately two weeks later, Posante went to Ford, Sr.'s residence for the purpose of arranging for disposition of another load of stolen merchandise. Ford, Sr. indicated that if the load contained a "box"[1] they might be able to obtain at least twenty-five thousand dollars for the load, which they would split on a fifty-fifty basis. Ford, Sr. agreed with Posante and his wife to make telephone calls to his Georgia connection to dispose of the merchandise.

Later during the evening of October 13, 1984, Posante and codefendant Bunn drove to the Coronet office to examine shipping documents with the hope of being able to select a trailer load with high value items.

After selecting one, Posante coupled his tractor to it and drove it to Smyrna. The following morning Posante informed Ford, Sr. about this trailer and his intent to obtain the manifest[2] from it. Shortly thereafter Ford, Sr., together with Posante and his wife, inspected the manifest, and Ford, Sr. advised Posante that he was awaiting a telephone call, and that they would have no difficulty in selling the load. That afternoon both the Fords came to Posante's residence where, in the presence of Bunn, they discussed moving the trailer of merchandise.

During the early evening hours, Ford, Sr. advised Posante to move the trailer to a place in Manchester, Tennessee. Posante, with the tractor-trailer, followed Ford, Sr. to Wayne Kemp's home in Manchester, Tennessee, where the trailer was unloaded. Posante then abandoned the trailer at a truck stop in Lebanon, Tennessee.

A few days later, Ford, Sr., using an alias, rented two trucks for a trip to Columbus, Georgia. A next door neighbor of Wayne Kemp noticed that some men were moving boxes from Kemp's house into a rental truck, and obtained the truck's number and reported the incident to the police. Although the neighbor was not "100%" positive, he identified the Fords as looking like two of the men involved. A law enforcement officer arrived at the Kemp house to inquire. One of the men involved advised that they were doing some moving work for the owner. The officer, however, made an incident report and identified the truck involved as the one rented to Ford, Sr.

Ford, Sr. paid Posante nine thousand dollars as his share of the proceeds from the sale of the stolen merchandise in accordance with their prior arrangement. Shortly after this transaction, Posante was arrested and he agreed to cooperate. Local police, working with the FBI, set up a "sting" operation whereby Posante was to advise Ford, Sr. that he had stolen another trailer

1. A box is a special container used to ship high value items such as gold rings, watches, and jewelry.

2. An invoice of cargo.

load of merchandise. Posante agreed to deliver the load to Ford, Sr.'s contacts in Georgia and to wear a recording device.

Ford, Sr., being informed about the latest load, placed calls to defendant Robert W. Davenport, who functioned as a middleman between Ford, Sr. and the ultimate purchaser, Thomas Edward Greer. Taped telephone conversations between Ford, Sr. and Posante indicating this arrangement were introduced into evidence at trial. Ford, Sr. instructed Posante to take the supposedly stolen load, accompanied by defendant Ford, Jr., to Greer. Ford, Jr. would receive the initial down payment, deliver it to Posante, who would then turn it over to Ford, Sr. for a split.

In accord with the plan, Posante and his wife met Ford, Jr. with the trailer containing goods of Service Merchandise, provided to the FBI for use in the operation. Posante wore a tape recorder and recorded their conversation. Posante and Ford, Jr. were instructed by Ford, Sr. to call "Bobby" when they came to Columbus, Georgia, the planned destination. Ford, Jr., in Posante's presence, placed a telephone call to "Bobby." Shortly thereafter, defendants Robert W. Davenport and Thomas E. Greer pulled up in Davenport's pick-up truck.

Thereafter Ford, Jr. and Posante followed Davenport and Greer including a stop at Greer's bar where Greer met with his brother. Davenport and Greer then escorted Posante and Ford, Jr. to a run-down store and warehouse in the area, where they proceeded to unload the merchandise. These defendants were then arrested. The merchandise was photographed and reloaded into the trailer. Additional numerous items of stolen merchandise coming from the earlier theft were also seized, photographed in Columbus, and returned to Service Merchandise.

A very small portable Panosonic television was observed attached to the dashboard of Davenport's pick-up truck, which was taken to a police impound lot where an inventory of the truck was conducted. The television set and its carton were seized. The serial number tag had been removed from both the television and its carton, but the proof showed that the television had come from an earlier stolen load. When Ford, Sr. was later arrested, a search was conducted of his residence pursuant to a duly authorized search warrant, and other stolen goods from Service Merchandise were located.

A search revealing merchandise stolen by Posante and Rager was also conducted in a mini-warehouse storage facility that Ford, Jr. had rented on October 5, 1984.

## II.

Defendants claim that a variance exists between the indictment charge and the government's evidence concerning the several thefts and disposition of the stolen merchandise. The indictment charges a single conspiracy, but defendants claim that the government proved instead multiple conspiracies. As this court has stated:

> If an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby. In determining whether the evidence showed single or multiple conspiracies, we must bear in mind that the essence of the crime of conspiracy is agreement. "[I]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Martino*, 664 F.2d 860, 876 (2d Cir.1981) (citation omitted). However, the government is not required to prove an actual agreement among the various conspirators in order to establish a single conspiracy. In one form of conspiracy, often described as a "chain" conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise. Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers,

are often "chain" conspiracies. Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants. Accordingly, a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy.

*United States v. Warner,* 690 F.2d 545, 548–49 (6th Cir.1982) (some citations omitted).

Testimony of the two Posantes and the other evidence would permit a rational jury to find either a single conspiracy or multiple conspiracies. The following testimony focuses on whether the conspiracy ended on October 28 when Davenport and Greer became involved with Posante and Ford, Jr.:

Q. After you got the money. Did you or did you not have any discussions with Mr. Ford, Sr. regarding selling additional loads of merchandise?

A. [MR. POSANTE] We had a conversation about, you know, how the fact—how they come up and got the merchandise and everything, and, you know, how they kind of liked what was on it, you know, and that, you know, we could like get it like a ring, always get rid of the stuff, as far as, you know, like another trailer load or whatever, whatever we wanted to get.

Q. Mr. Ford, Sr. told you exactly what, then, try to put it in his words, if you can.

A. As far as what you mean like another load or something is that what you mean?

Q. If you can put it in what is known as first person, that is what words did he speak if you recall.

A. What words he used?

THE COURT: What did he say to you and what did you say to him?

THE WITNESS: That's what I'm trying to think. To the best of my knowledge, be something like I asked him, I stopped by the car lot, I just got in and everything, I asked how everything went. He said fine, stuff was already gone. And he said just come up here one day and got everything and left with it. I said okay. He said yeah. Really happy. I don't know, word for word, yeah, really happy about it. He could always move stuff like that nature.

\*      \*      \*      \*      \*      \*

Q. You had no way of knowing did you, Mr. Posante, whether you ever would have dealt with Mr. Ford again had the FBI not furnished you the Service Merchandise load.

A. I don't know if I would or wouldn't. I probably would have if I did it again.

Q. If you did, but you don't know whether you would have ever done that again or not with regard to Cornet Truck Lines.

A. Right.

The government contends the conspiracy was flexible and, in effect, open-ended. The criminal acts pursuant to the conspiracy did not require significant planning. Ford, Sr. required only twenty-four hours notice and no extensive planning to arrange to dispose of the stolen cargo. The government also points to the taped conversation of Ford, Sr. on October 28, the date on which defendants contend the first conspiracy ended, stating that he would "stay low for *awhile.*"

We conclude that the testimony is sufficient to support the prosecution's single conspiracy theory of the case. Drawing reasonable inferences from the testimony, a reasonable jury could believe that Ford, Sr. was in contact with his Georgia connections (Davenport and Greer) from the outset, and that Ford, Jr. was involved in a number of transactions. We therefore uphold the jury's determination that a single conspiracy existed, as well as the jury's finding that all three defendants partici-

pated in the conspiracy to a greater or lesser extent.

### III.

■ Defendants also claim that the trial court erred by refusing to give the jury instructions on their theory of the case. Although we have decided there was adequate basis for finding a single conspiracy, there was also proof that might support multiple conspiracies. In *United States v. Sutherland*, 656 F.2d 1181 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982), the court referred to the circumstances in which defendants are entitled to a jury instruction on a multiple conspiracy theory:

> In this case the government introduced no evidence from which a jury could conclude that a single conspiracy existed among the defendants. This case should be distinguished, therefore, from cases in which the record contains, in addition to evidence of multiple conspiracies, sufficient evidence to support a finding of a single conspiracy. If the government sufficiently supports its charge of single conspiracy, evidence at trial of multiple conspiracies does not of itself create a material variance with the indictment; at most, such evidence creates a fact question and entitles the defendants to a jury instruction on the possibility of multiple conspiracies. *See United States v. Elliott, supra*, [571 F.2d 880], at 905 [ (5th Cir.1978) ], *United States v. Varelli*, 407 F.2d 735, 746–47 (7th Cir.1969).

*Id.* at 1189 n. 5.

In *United States v. Warner*, 690 F.2d at 550, this court agreed with *Sutherland* that when the evidence would permit a jury to find either a single or multiple conspiracy, the trial court should give the jury an instruction on multiple conspiracy. In *Warner*, however, the defense did not request an instruction on multiple conspiracy. Neither did defendant object when the court failed to give one. We reviewed this failure to instruct for plain error, and declined to find reversible error because the jury instructions sufficiently informed the jury that it could only convict the defendant for a "conspiracy alleged in the indictment of which he was a part." *Id.; see also United States v. Piccolo*, 723 F.2d 1234, 1240–41 (6th Cir.1983) (en banc), *cert. denied*, 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 817 (1984).

In the present case, on the other hand, defendants Greer and Davenport did object to the jury instructions on the grounds the instructions did not make clear that the jury could find two conspiracies and thus establish a variance from the indictment. The instructions given by the district court, in part, were:

> The evidence in the case need not show that the alleged members of the conspiracy entered into any express or formal agreement; or that they directly stated between themselves the details of the scheme and its object or purpose, or the precise means by which the object or purpose was to be accomplished. Similarly, the evidence in the case need not establish that all of the means or methods set forth in the indictment were, in fact, agreed upon to carry out the alleged conspiracy, nor that all of the means or methods which were agreed upon were actually used or put into operation. Neither must it be proved that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

> What the evidence in the case must show beyond a reasonable doubt is:

> (1) That two or more persons in some way or manner, positively or tacitly and impliedly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

> (2) That a defendant willfully became a member of such conspiracy;

> (3) That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods (or "overt acts") described in the indictment; and

> (4) That such "overt act" was knowingly committed at or about the time

alleged in an effort to effect or accomplish some object or purpose of the conspiracy.

\* \* \* \* \* \*

One may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. So, if a defendant, with an understanding of the unlawful character of a plan, knowingly and willfully joins in an unlawful scheme on one occasion that is sufficient to convict him for conspiracy even though he had not participated at earlier stages in the scheme and even though he played only a minor part in the conspiracy.

Of course, mere presence at the scene of an alleged transaction or event, mere association with persons involved in a criminal enterprise, or mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some object or purpose of a conspiracy, does not thereby become a conspirator.

In your consideration of the conspiracy offense as alleged in the indictment, you should first determine, from all of the testimony and evidence in the case, whether or not the conspiracy existed as charged. In this connection you should consider the statements of alleged coconspirators with caution. If you conclude that a conspiracy did exist as alleged, you should next determine whether or not the defendant under consideration willfully became a member of such conspiracy.

While the district court also should have instructed the jury more specifically on Greer's and Davenport's theory of multiple conspiracy, we cannot say that reversible error has occurred. On careful considera-tion, we conclude that the failure of the trial court to give the specific instructions on multiple conspiracy to which the defendants were entitled was harmless error.

The jury was required to find that there was evidence beyond a reasonable doubt indicating that each defendant was involved in an ongoing arrangement extending over two months to steal, unlawfully transport in interstate commerce, and to conceal and sell such goods in the statutory requisite amount. Each party had the opportunity to argue his position to the jury on the evidence. We are persuaded that there was a fair trial despite the trial court's failure to instruct on defendants' theory. Each defendant was sufficiently connected to the illegal scheme charged and the principle figures, Ford, Sr. and Jr., to sustain the verdict. We conclude, however, that this is a closed issue.

## IV.

Defendant Greer originally appealed his conviction along with Ford and Davenport. Before issuance of this decision, however, he filed an uncontested motion to dismiss his appeal. We have considered and hereby grant the motion to dismiss the appeal by Greer. It is therefore unnecessary for us to consider his contentions herein.

## V.

Davenport contends that the search for and seizure of the television set from his pickup truck, which was identified as exactly like the ones stolen from a Service Merchandise shipment, should have been deemed illegal. He bases this argument on both the lack of any probable cause "to believe that [he] ... had any contraband in the vehicle," and failure to request a search warrant. We believe there was probable cause on this record to support the seizure of the truck and to make an inventory search of the vehicle.[3] *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976);

3. A pistol seized in this truck was not intro-duced as evidence.

*United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir.1982).

There was sufficient evidence to sustain the conviction as to each charge and each defendant under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standards. We find no reversible error, and therefore AFFIRM the conviction of both defendants.