983 F.2d 1070
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eleanor ROBELIN, Jesus Mesa, Jose Aquerre, Antonio Chantaca,
Anacleto Sepulveda-Aquerre, Roberto Lugo, Ricardo
Robelin, Robert Molina, Raquel Robelin,
Ricardo Arredondo,
Defendants-Appellants.
 Nos. 91-1026, 91-1144, 91-1146, 91-1238, 91-1243, 91-1245,
91-1247, 91-1272, 91-1275 and 91-1483.
 United States Court of Appeals, Sixth Circuit.
 Jan. 14, 1993.
 
 Before KEITH and NATHANIEL R. JONES, Circuit Judges, and ALLEN, Senior District Judge.[1]
 PER CURIAM:
 
 
 1
 This consolidated appeal involves several defendants convicted in the Eastern District of Michigan for conspiring to distribute controlled substances, in violation of 21 U.S.C. § 846, and possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a). This conspiracy took place in Saginaw, Michigan between 1983 and 1990 and purportedly involved each of the defendants to varying degrees. Each defendant brings several issues, jointly and individually, on appeal. For the reasons stated below, we AFFIRM their convictions and sentences.
 
 I.
 
 2
 In the latter part of 1983, Anacleto Sepulveda-Aquerre moved to the Saginaw, Michigan area from Chicago, Illinois. The record indicates that between 1983 and 1989, Jose Aquerre, Anacleto's brother, remained in Chicago and acted as Anacleto's main supplier of narcotics in the conspiracy. Testimony during the course of the trial further indicated that Anacleto would travel to Chicago approximately twice per month and would transport between 10-20 ounces of heroin and 5-8 ounces of cocaine to Saginaw for the duration of the conspiracy. The distribution of these narcotics took place at several residences in the Saginaw area during the conspiracy. The record indicates that the conspirators sold narcotics from North Carolina Street (Saginaw, MI)--the residence of Maria Theresa Esparza[2] (1983-1984); Perkins Street (Saginaw, MI)--Anacleto's personal residence (1984); Lapeer Street (Buena Vista, Michigan)--Anacleto's personal residence (1984-November 1985); California Street (Saginaw, MI)--Anacleto's personal residence with Maria Theresa Esparza (November 1985-May 1987); the residence of Frank and Christina Diaz (1984-1986);[3] Gilbert Street (Saginaw, MI)--Anacleto's personal residence with Maria Theresa Esparza (August 1987-February 1988);[4] 1653 Boxwood (Saginaw, MI)--Anacleto's personal residence (November 1988-1989); 1259 Huntley (Saginaw, MI)--the residence of Ricardo and Eleanor Robelin (1987-1989); and 2200 California Street (Saginaw, MI)--the residence of Mary Jane Dietrich (January of 1990).
 
 
 3
 Several of the co-conspirators became involved in the conspiracy by weighing the narcotics for sale and distribution and driving Anacleto and Jose, both of whom purportedly have poor eyesight, to and from their deliveries. Testimony indicated that Antonio Chantaca, Roberto Lugo, Jesus Mesa, and Robert Molina acted in either or both of these capacities for the Aquerre brothers at various times during the conspiracy. Additionally, Roberto Lugo rented the property at 1653 Boxwood in Saginaw, Michigan, which became the venue for most of the drug distribution between 1988 and 1989. The record also indicates that Ricardo Robelin installed the telephone service at that residence.
 
 
 4
 Anacleto acted as the major supplier for several of his co-conspirators. Testimony by Christina Diaz indicates that, approximately every two weeks between 1984-1986, Anacleto sold heroin and cocaine in half-kilogram quantities to her and her husband, Frank. Co-conspirators, Ricardo and Eleanor "Lonnie" Robelin and their daughter, Raquel, would acquire narcotics from Anacleto, which they sold from their Huntley Street residence in Saginaw, Michigan. Additionally, Darryl Morgan testified that he obtained narcotics for redistribution from Anacleto, Molina and Ricardo Arredondo.
 
 
 5
 Several narcotics raids in late 1989 and early 1990 led to the arrest of each of the co-conspirators. The termination of the conspiracy in February 1990 resulted in the superseding indictment of twelve individuals for drug trafficking offenses on August 8, 1990.[5] Before the trial began, Eleanor Robelin pled guilty to count 8 of the indictment, which charged her with possession of marijuana with intent to distribute on February 6, 1990.
 
 
 6
 Trial commenced on September 10, 1990. The jury rendered its verdict on October 19, 1992. The district court entered the following judgments and sentences[6] with regard to each defendant now on appeal:
 
 Eleanor Robelin--guilty plea
 
 7
 18 U.S.C. § 841 possession w/intent to distribute marijuana
 
 
 8
 41 months followed by 2 years of supervised release
 
 
 9
 Jesus Diaz Mesa--18 U.S.C. § 846 conspiracy
 
 
 10
 157 months followed by 5 years of supervised release
 
 Jose Aquerre--18 U.S.C. § 846 conspiracy
 
 11
 328 months followed by 5 years of supervised release
 
 
 12
 Antonio Chantaca--18 U.S.C. § 846 conspiracy
 
 
 13
 130 months followed by 5 years of supervised release
 
 Roberto Lugo--18 U.S.C. § 846 conspiracy
 
 14
 136 months followed by 5 years of supervised release
 
 
 15
 Anacleto Sepulvaeda-Aquerre--18 U.S.C. § 846 conspiracy
 
 
 16
 480 months followed by 10 years of supervised release
 
 
 17
 18 U.S.C. § 841 possession w/intent to distribute heroin
 
 
 18
 480 months followed by 8 years of supervised release
 
 
 19
 18 U.S.C. § 841 possession w/intent to distribute cocaine
 
 
 20
 480 months followed by 8 years of supervised release
 
 
 21
 Ricardo Robelin--18 U.S.C. § 846 conspiracy
 
 
 22
 252 months followed by 10 years of supervised release
 
 18 U.S.C. § 841 distribution of heroin
 
 23
 240 months followed by 6 years of supervised release
 
 Robert Molina--18 U.S.C. § 846 conspiracy
 
 24
 130 months followed by 5 years of supervised release
 
 
 25
 Raquel Robelin--18 U.S.C. § 846 conspiracy
 
 
 26
 78 months followed by 5 years of supervised release
 
 
 27
 18 U.S.C. § 841 possession w/intent to distribute
 
 
 28
 60 months followed by 2 years of supervised release
 
 
 29
 Ricardo Arredondo--18 U.S.C. § 846 conspiracy
 
 
 30
 240 months followed by 10 years of supervised release
 
 
 31
 18 U.S.C. § 841 distribution of heroin (11-07-89)
 
 
 32
 151 months followed by 6 years of supervised release
 
 
 33
 18 U.S.C. § 841 distribution of heroin (12-04-89)
 
 
 34
 151 months followed by 6 years of supervised release
 
 
 35
 Each of these defendants perfected timely appeals.
 
 II.
 
 36
 The several defendants, collectively and individually, present myriad issues on appeal, and many of these challenges overlap. Accordingly, this court will address each issue seriatim below.
 
 A.
 
 37
 Defendants Jose Aquerre, Jesus Mesa, Roberto Lugo, Robert Molina, Ricardo Arredondo, and Ricardo and Raquel Robelin argue that there is insufficient evidence to support their respective convictions. On appeal, this Court's inquiry is limited to determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). In this posture, we do not assess the credibility of trial witnesses; rather this court leaves the responsibility of resolving conflicts in testimony, weighing the evidence, and drawing inferences therefrom to the trier of fact. Id.
 
 
 38
 With respect to each of these challenges, the record is replete with evidence that each of these defendants was involved in the conspiracy at some point during its existence. Jose Aquerre played an integral part in the conspiracy from its inception. Jose Aquerre's primary role was as supplier of the controlled substances from Chicago. The record also indicates that Jose acted as Anacleto's surrogate in Saginaw, Michigan during his brother's absence.
 
 
 39
 Additionally, Jesus Mesa, Roberto Lugo, and Robert Molina each operated in virtually the same capacity within the conspiracy. They variously acted as drivers, wired money to Chicago for the purchase of the controlled substances, weighed and distributed the narcotics to others for sale and personal use, and collected debts for the conspiracy.
 
 
 40
 Moreover, Ricardo Arredondo seemingly operated one arm of the drug distribution network of the Aquerre brothers. Darryl Morgan, Mary Jane Dietrich and Jesse Lucio each testified that they regularly purchased controlled substances from Arredondo. Also, Cindy Kwiatowski, a former drug user, purchased heroin from Arredondo in her capacity as government informant on November 7 and December 4, 1989.
 
 
 41
 Finally, Ricardo Robelin and his daughter, Raquel, operated another mini-operation within the conspiracy. They apparently purchased large quantities of narcotics from Anacleto while he lived at the Gilbert Street and Boxwood Street addresses, and sold them from their home and a corner party store. Accordingly, with regard to each of these defendants, this assignment of error must fail.
 
 B.
 
 42
 Several defendants also challenge the district court's Vinson-Enright ruling, which admitted the statements of an unindicted co-conspirator over the hearsay objection of the defendants. The district court permitted Mary Jane Dietrich to testify to statements made by her boyfriend and unindicted co-conspirator, Jesse Lucio. Jesse Lucio had informed her that he purchased drugs from Anacleto and Jose for his personal use and resale. On appeal, Antonio Chantaca, Lugo, Molina, and Arredondo contend that the district court erred when it admitted this testimony as substantive evidence.
 
 
 43
 The Federal Rules of Evidence provide that "[a] statement is not hearsay if--[t]he statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Moreover, in United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980), this Court stated:
 
 
 44
 The judge may ... admit the hearsay statements [of co-conspirators] subject to later demonstration of their admissibility by a preponderance of the evidence. If this practice is followed, the court should stress to counsel that the statements are admitted subject to defendant's continuing objection and that the prosecution will be required to show by a preponderance of the evidence that a conspiracy existed, that the defendant against whom the statements are hearsay was a participant and that the statements were made in the course and in the furtherance thereof.
 
 
 45
 Id. at 153. See also United States v. Enright, 579 F.2d 980 (6th Cir.1978).
 
 
 46
 In this case, the district court followed a course expressly permitted by Vinson. The court conditionally admitted the statements of Jesse Lucio and subsequently found that a conspiracy existed. Ample evidence connected Chantaca, Lugo, Molina and Arredondo to the conspiracy. Moreover, the district court found that Jesse Lucio "was a member of the conspiracy, purchasing drugs from the Sepulvedas [Anacleto and Jose], from the Sepulveda organization, and reselling them to others knowingly and intentionally on more than one occasion." Thus, the statements fall squarely within the Fed.R.Evid. 801(d)(2)(E), and the district court's actions were in accord with Enright and Vinson.
 
 C.
 
 47
 The defendants, with the exception of Anacleto Sepulveda-Aquerre, challenge the propriety of the district court's jury instructions regarding the existence of the conspiracy. They allege that the evidence showed that multiple conspiracies existed between 1983 and 1990 and that the presentation of such evidence at trial constituted a prejudicial variance from the indictment. During the trial, the district court stated:
 
 
 48
 I have no difficulty determining that a conspiracy existed.... And the conspiracy existed during the span of time that is encompassed by the indictment. As do [sic] that issue, I think that the evidence is replete and needs no further elaboration.
 
 
 49
 Additionally, the district court gave the following jury instruction regarding conspiracy:
 
 
 50
 What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to commit the crime of possessing with intent to distribute heroin and cocaine and the crime of distributing heroin and cocaine. This is essential. An agreement can be proved indirectly by facts and circumstances which lead to a conclusion that an agreement existed, but it is up to the government to convince you that such facts and circumstances existed in this particular case.
 
 
 51
 Now, if your are convinced that there was a criminal agreement, then you must decide whether the government has proved that each defendant knowingly and voluntarily joined that agreement and you must consider each defendant in this regard. To convict any defendant, the government must prove that he or she knew the conspiracy's main purpose and that he or she voluntarily joined it intending to help advance or achieve its goals....
 
 
 52
 If you decide that there was one single conspiracy and that a defendant knowingly and voluntarily joined it, that would be sufficient to convict that defendant of the conspiracy charge. If you decide, however, that there were two or more separate conspiracies, then you must consider the evidence relating to each conspiracy separately. For each one you must decide whether the government has proved the criminal agreement. If the government proves that any one of the two or more claimed conspiracies existed and that a defendant knowingly and voluntarily joined it, that would be sufficient to convict the defendant of that conspiracy charge. If, on the other hand, the government fails to prove any agreement or conspiracy as charged in the indictment, of course, you may not find any defendant guilty of a conspiracy charge.
 
 
 53
 This Court has held that a conspiracy exists when two or more individuals agree to participate in a collective venture directed toward a common goal. See United States v. Warner, 690 F.2d 545 549 (6th Cir.1982). "The agreement may continue for a long period of time and may include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies." Id. at 549 n. 7 (quoting United States v. Varelli, 407 F.2d 735, 742 (7th Cir.1969). Additionally, this Court has determined that jury instructions, as a whole, need only fairly and adequately represent the issues and the state of the law to the jury. See United States v. Buckley, 934 F.2d 84 (6th Cir.1991). Moreover, the failure to give an explicit multiple conspiracy charge has been deemed harmless error, when the court has accurately instructed the jury with regard to proof of participation and where the defendants had the opportunity to argue the multiple conspiracy theory to the jury. See United States v. Davenport, 808 F.2d 1212 (6th Cir.1987).
 
 
 54
 We believe that the district court did not commit prejudicial error in this case when it instructed the jury with regard to the conspiracy. First, the proof presented at trial did not appear at variance with the conspiracy count in the indictment. Second, while several defendants may have engaged in minor conspiracies, the evidence is consistent with a finding that these actions were in furtherance of an overall, common venture. See United States v. Warner, 690 F.2d 545, 550 n. 8 (6th Cir.1982). Finally, the jury instructions fairly apprised the jury of the elements of a conspiracy and that each defendant must have purposefully participated in the furtherance of the conspiracy before he/she could be found guilty. Accordingly, we find that this assignment of error has no merit.
 
 D.
 
 55
 Anacleto Sepulveda-Aquerre, Robert Molina, and Roberto Lugo contend that they were unfairly prejudiced because two jurors observed them in handcuffs and in the custody of federal marshals. The marshals were transporting these three defendants from the courthouse in an elevator, when they encountered three jurors waiting for the elevator. It is unclear what the jurors saw. The marshals, however, asked the jurors to take another elevator, and the elevator door closed. The jurors subsequently took the stairs.
 
 
 56
 Upon hearing of this incident, the court conducted voir dire, questioning each juror on the record about the incident before proceeding with the trial. It appears that only two jurors recalled the incident, both of whom indicated that their ability to judge the case had not been affected by the incident. The trial judge then reminded the two jurors that the defendants were presumed innocent and that the government had the burden of proving that each defendant was guilty. The court subsequently denied defense counsels' motion for a mistrial.
 
 
 57
 We review the denial of defense counsels' motion for a mistrial for abuse of discretion. United States v. Peveto, 881 F.2d 844, 859 (10th Cir.), cert. denied, 493 U.S. 943 (1989). The Supreme Court has held that defendants must show that they suffered either inherent or actual prejudice when jurors have accidentally viewed them in protective custody. See Holbrook v. Flynn, 475 U.S. 560, 567 (1986). This court held in United States v. Barger, 931 F.2d 359 (6th Cir.1991), that "[i]t is not inherently prejudicial to bring a defendant to the courthouse or courtroom in custody as a security measure." Id. at 371. In Barger, after a juror notified the court that he had seen the defendant in handcuffs during the course of the trial, the court questioned the juror in the presence of defense counsel. The juror responded that the sighting had not affected his ability to independently judge the case. The trial court denied the motion for mistrial. Given those facts in Barger, this Court concluded that neither actual nor inherent prejudice had been established, and therefore, the defendant was not denied his right to a fair trial. Id. at 372.
 
 
 58
 On these facts, we cannot say that the district court abused its discretion by denying this defense motion. Upon notification that jurors may have viewed the defendants in protective custody, the court promptly conducted voir dire. The record reflects that only two jurors recalled the incident, and of the two, one could not readily identify which defendants she had seen. In his judgment, the district judge determined that the incident neither actually nor inherently prejudiced the defendant. Accordingly, this Court does not have "a definite and firm conviction that the trial court committed a clear error of judgment. See Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir.1989) (defining abuse of discretion).
 
 E.
 
 59
 Roberto Lugo and Ricardo Arredondo contend that their respective motions for severance of their cases were improperly denied. They each argue that they should have been granted separate trials because much of the evidence admitted during the course of the trial did not involve them and was therefore prejudicial to their defense. This court has determined that, if a defendant fails to renew his motion for severance at the close of the evidence, the severance claim is deemed waived. See United States v. Patrick, 965 F.2d 1390, 1400 (6th Cir.), cert. denied, 113 S.Ct. 376 (1992); United States v. Sturman, 951 F.2d 1466, 1476 (6th Cir.1991), cert. denied, 112 S.Ct. 2964 (1992). The renewal of a motion for severance at the close of proofs gives the district court the opportunity to assess the need for separate trials in light of the evidence presented, thereby creating a record for review. See United States v. Swift, 809 F.2d 320, 323 (6th Cir.1987).
 
 
 60
 The record indicates that neither Lugo nor Arredondo renewed his motion for severance at the close of the government's case or at the close of all of the evidence. Accordingly, the challenge is waived on this appeal.
 
 F.
 
 61
 Anacleto Sepulveda-Aquerre complains that reference to his pre-1983 prison term by Maria Theresa Esparza was unfairly prejudicial. This remark came during cross-examination by Anacleto's counsel on October 5, 1990. The defense objected to this reference four days later, following Esparza's testimony and the testimony of several other witnesses. At this time, Anacleto's counsel made a motion for mistrial and, in the alternative, moved to have the remark stricken from the record. The district court denied both requests but offered to give the jury a cautionary instruction, which defense counsel refused. We review the district court's denial of the defense motion for a mistrial for abuse of discretion. United States v. Peveto, 881 F.2d 844, 859 (10th Cir.), cert. denied, 493 U.S. 943 (1989). We note that, if a remark is brief and isolated, it is not so egregious as to deserve a curative instruction. United States v. Soulard, 730 F.2d 1292, 1303 (9th Cir.1984).
 
 
 62
 The district court did not abuse its discretion by denying defense counsel's motion for a mistrial. Esparza's reference to Anacleto's 1977-1983 prison term came in response to defense counsel's own question. Additionally, Esparza's testimony was quite lengthy, and these brief remarks appeared to contextualize her relationship with Anacleto. Accordingly, the court committed no error.
 
 
 63
 Anacleto also claims that Mary Jane Dietrich's testimony regarding a telephone conversation between Anacleto and Jose Aquerre was admitted in error. Dietrich's testimony described a conversation in which Anacleto and Jose discussed killing Ricardo Arredondo. Anacleto claims that because he was already in custody, the conspiracy was over and the conversation is not admissible under the hearsay rule exception for statements made in the furtherance of a conspiracy. See Fed.R.Evid. 801(d)(2)(E). The district court ruled that the statements were made in furtherance of the conspiracy because additional narcotics were being transported and sold during this time.
 
 
 64
 We review this evidentiary ruling abuse of discretion. See United States v. Ebens, 800 F.2d 1422, 1433 (6th Cir.1986). Here, the district court evaluated the circumstances surrounding the testimonial event and determined that the conspiracy still continued. We cannot say that this factual evaluation was in error. Accordingly, the district court did not abuse its discretion by admitting Dietrich's testimony.
 
 G.
 
 65
 Ricardo Arredondo contends that the government failed to provide exculpatory material, in violation of Brady v. Maryland, 373 U.S. 83 (1963) and that the district court improperly admitted the grand jury testimony of Mary Jane Dietrich. Arredondo contends that the government did not provide the defense with Dietrich's sworn statement that failed to identify him as the narcotics supplier to Dietrich and Jesse Lucio. Dietrich subsequently testified to the contrary at trial.
 
 
 66
 The record indicates that defense counsel was privy to Dietrich's statement. It appears that when the government attempted to introduce a portion of this statement during its case-in-chief, defense counsel acknowledged its receipt. Accordingly, the claimed Brady violation lacks merit.
 
 
 67
 Moreover, the grand jury testimony was admitted to rebut a portion of Dietrich's testimony as being inconsistent with prior sworn testimony. See Fed.R.Evid. 801(d)(1)(A) (stating that a prior inconsistent statement is not hearsay, and is admissible as substantive evidence). Portions of the grand jury testimony were admitted only after Dietrich equivocated with regard to her recollection of the facts. Accordingly, the trial court did not abuse its discretion by admitting this testimony.
 
 H.
 
 68
 Eleanor Robelin appeals the denial of her motion to suppress certain evidence seized during the drug raid that took place at her residence in February 1990. Robelin pled guilty pursuant to a Rule 11 plea agreement but did not expressly reserve her right to appeal the denial of the suppression motion. Accordingly, this challenge is waived on appeal. See United States v. Pickett, 941 F.2d 411, 415-16 (6th Cir.1991).
 
 I.
 
 69
 Each defendant challenges his/her respective sentence. Specifically, they each contend that the trial judge made speculative determinations with regard to the amount of drugs involved in the conspiracy, and therefore, each sentence was in error. In United States v. Walton, 908 F.2d 1289 (6th Cir.), cert. denied, 111 S.Ct. 532 (1990), this Court stated:
 
 
 70
 Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, ... similar transactions in controlled substances by the defendant....
 
 
 71
 Walton, 908 F.2d at 1301 (quoting from the former Application Note 2 to U.S.S.G. § 2D1.4 which utilized the same language until the guideline was repealed effective November 1, 1992). The Walton court further stated that a district court's determination of the quantity of narcotics for which each "defendant is to be held accountable ... is a finding of fact which must be accepted by a court of appeals unless clearly erroneous." Id. at 1300-01.
 
 
 72
 We have carefully reviewed the record and the sentences imposed for each defendant and find no error warranting reversal. The record reflects that the district court carefully considered each of the defendant's unique circumstances in assessing each sentence. Accordingly, the sentences imposed are affirmed.
 
 III.
 
 73
 For the foregoing reasons, we AFFIRM the jury convictions and sentences imposed by the Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan.
 
 
 
 [1]
 The Honorable Charles M. Allen, Senior United States District Judge for the Western District of Kentucky, sitting by designation
 
 
 [2]
 Maria Theresa Esparza was originally indicted as a co-conspirator for distribution of cocaine and heroin. The government agreed to drop the conspiracy charges in the indictment in exchange for her testimony at trial
 
 
 [3]
 The residence of Christine and Frank Diaz was raided in November of 1986. At that point, the record indicates that Anacleto did not continue to supply the Diazes with large quantities of narcotics for distribution
 
 
 [4]
 This residence was raided on February 22, 1988
 
 
 [5]
 Mary Jane Dietrich's case was severed from this case and she received immunity for her testimony at trial. Jesus Vidana was acquitted of the charges against him
 
 
 [6]
 The sentences for each defendant convicted of multiple offenses run concurrently